IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 15-cv-02399-RPM

ZACHARY G., a minor, by and through his parents and next friends,
MARK G. and ROBIN F.,

      Plaintiffs,

v.

SCHOOL DISTRICT NO. 1 for the City and County of Denver,

      Defendant.

_____

MEMORANDUM OPINION AND ORDER
_____

      Mark G. and Robin F. are the parents of Zachary G. (Zachary), now 17 years old, who was born with a genetic disorder diagnosed as Prader-Willi Syndrome (PWS). In May, 2015, they placed Zachary at Latham Centers (Latham), a private residential school facility in Massachusetts specializing in the care and education of children with PWS. In this civil action the parents seek reimbursement for the costs of Zachary's placement at that facility, claiming that School District No. 1 for the City and County of Denver (District) failed to develop an individualized education plan (IEP) for the 2015-2016 academic year that would provide their son with a free appropriate public education (FAPE) as required by the Individuals with Disabilities Education Act (IDEA). The IDEA provides jurisdiction for this case.[1]

_____
[1] 20 U.S.C. § 1415(i)(2)(A).

**Background and Facts**

As required by the IDEA, Plaintiffs received a due process hearing before an Administrative Law Judge (ALJ). After eight days of evidentiary hearings the ALJ issued a Decision on July 31, 2015, denying the claim and concluding that the District had prepared an IEP that was "reasonably calculated to provide meaningful educational progress" for Zachary which the parents rejected by withdrawing their son from school and unilaterally placing him at Latham.

The party alleging a deficiency in an IEP bears the burden of persuasion.[2] The standard governing this Court's review of the ALJ's decision is "modified *de novo.*"[3] Specifically, the Court must receive the record of the administrative proceedings, hear additional evidence at the request of a party, and base its decision on the preponderance of evidence.[4] "At the same time, though the statute specifies that review is *de novo,* the Supreme Court has interpreted the requirement that the district court receive the administrative record to mean that 'due weight' must be given to the administrative proceedings. . . ."[5] This means that this Court conducts an independent review of the evidence,[6] but the ALJ's factual findings are to be considered "prima facie

---

[2]  *Schaffer ex rel. Schaffer v. Weast,* 546 U.S. 49, 62 (2005).

[3]  *Garcia v. Bd. of Educ. of Albuquerque Public Schools*, 520 F.3d 1116, 1125 (10th Cir. 2008).

[4]  *Id.;* 20 U.S.C. § 1415(i)(2)(C).

[5]  *Garcia*, 520 F.3d at 1125 (*quoting Bd. of Educ. v. Rowley,* 458 U.S. 176, 206 (1982)).

[6]  *Thompson R2-J Sch. Dist. v. Luke P. ex rel. Jeff P.*, 540 F.3d 1143, 1150 (10th Cir. 2008).

correct."[7] The entire administrative record has been lodged and reviewed by this Court and oral argument was heard. No party has submitted additional evidence.

The ALJ made detailed findings of fact supporting his decision. Many of them are not disputed. Plaintiffs' case is primarily dependent on the testimony of opinion witnesses. The ALJ found them to be "unconvincing." That suggests he was applying a higher standard of proof than preponderance of the evidence and summarily discounts the evidence without an adequate explanation. Given that these opinions are at the core of this controversy with a focus on Zachary's particular needs, particularly the requirement of total food security, a *de novo* review of the record concerning the food security issue is required.

To avoid confusion this Court upon a review of the evidentiary record makes the following narrative of events as *de novo* findings of fact.

There is no material dispute about the medical diagnoses adversely affecting Zachary's ability to progress in a normal school setting. Zachary has an uncommon subtype of PWS that occurs in approximately 25% of those afflicted. Individuals with this subtype often have more severe symptoms. Typical manifestations of PWS early in life include weak muscle tone, feeding difficulties, and delayed development. Later in childhood, persons with PWS typically develop hyperphagia – persistent extreme hunger and an inability to feel satisfied. They often experience extreme stress and anxiety related to their constant feeling of hunger and obsession with food, to the point that they are unable to focus on anything else. Even seeing or smelling food can cause extreme anxiety and perseveration about how to access the food, even if the event

---

[7] *Garcia*, 520 F.3d at 1125.

occurred in the past. If an individual with PWS is permitted uncontrolled access to food, there is a risk of overeating to the point of gastric rupture and possible death. Given Zachary's PWS, food security is a central concern in providing his education.

In addition to PWS, Zachary has been diagnosed with a mood disorder, general anxiety disorder, autism spectrum disorder, and mild intellectual disability in the form of a nonverbal learning disability. These mental health problems manifest in a host of challenging behaviors, including moodiness, sleep disturbance, severe anxiety, anger outbursts, aggressive behavior, refusal to participate in activities (including going to school), and others.

Zachary was able to achieve educational benefit in District schools, Bromwell Elementary and Place Bridge Academy Middle School, through approximately the first half of eighth grade. He was identified early as a child who needed special education services under the IDEA, and attended these schools with the support of IEPs developed annually for him by the District. In middle school his time was divided between general education classes and special education classes designed to accommodate students with mild to moderate impairments. He did not perform at grade level, but it is not disputed that he made academic progress, consistently doing fairly well in reading and writing, but poorly in mathematics.

During fifth, sixth, and seventh grade Zachary's behavior problems began to increase, as is typical of individuals with PWS. These behaviors included a number of incidents of both verbal and physical aggression. School behavior problems increased to some extent during eighth grade, although the District's witnesses described most of

the incidents as tantrums and verbal aggression, rather than physically threatening or violent.

Travis Depew, who worked with Zachary as a paraprofessional during Zachary's seventh grade year and was Zachary's eighth grade special education teacher, testified that Zachary had two incidents during eighth grade that did involve physical aggression. On one occasion Zachary resisted staying at school when his mother dropped him off and struck both his mother and Depew as they attempted to deal with him. Depew calmed Zachary down and kept him at school for the day. Depew stated that this type of incident is "common" with the students he works with as a special education teacher. On another occasion, a food-related incident, Zachary grabbed for something in a paraprofessional's hand and tore her shirt. No one was injured in either incident, and Zachary remained in school after both. There is evidence of other misbehaviors, such as pulling a fire alarm for which Zachary was suspended. Depew testified, however, that he was always able to get Zachary de-escalated, he never called the parents to come get Zachary, he never physically restrained Zachary, and he never called 911 or law enforcement.

Despite these behavioral incidents, Depew testified that during seventh grade and the first two trimesters of Zachary's eighth grade year (2013-14), Zachary was able to access his education. He attended school just about every day, participated in both special and general education classes, and was doing academically better than most of Depew's other students in reading and writing, though continuing to struggle in math. Depew felt he had a good relationship with Zachary, good communications with his

parents, and that he was successfully implementing Zachary's IEP for the eighth grade school year. Depew testified that in his experience, Zachary's behaviors were "better than most" compared to other students Depew dealt with, in terms of behaviors that required him to interrupt class and deal with them. He stated that Zachary's behaviors were of "pretty close to average" intensity, and that Zachary's de-escalation times were probably faster than most other students'.

In January 2014 Depew scheduled a preliminary meeting to discuss Zachary's options and the IEP preparation process for his anticipated transition to high school in the fall of 2015. Depew, a general education teacher, and Zachary's parents attended that meeting on February 3, 2014. At the meeting Depew even discussed the possibility that Zachary might need to transition from the "multi-intensive" level of special education in Mr. Depew's classroom to a "mild/moderate" setting in high school because of concerns that Zachary's testing results might come out higher than would qualify him for continued placement at the multi-intensive level.

In contrast to Depew's testimony, Zachary's parents testified that during the fall and winter of Zachary's eighth grade year his self-care skills, school refusals, and other behaviors at home deteriorated significantly. These problems escalated to the point that on February 20, 2014, Zachary's parents took him to the Children's Hospital ("Children's Colorado") emergency department in Denver when they were unable to deal with a severe tantrum at home involving refusal to go to school. Zachary was admitted to the Neuropsychiatric Special Care (NSC) unit at Children's Colorado for treatment of severe anxiety, aggression, obsessive-compulsive behavior, and other

symptoms.

Zachary was intermittently treated at the Children's Colorado NSC unit on both an inpatient basis and outpatient day treatment basis from February to late May 2014. During that period, Zachary's behaviors alternately improved and deteriorated. He was discharged from day treatment on March 28 in anticipation that he would transition back to school after spring break, and he and his parents travelled to New York City on a family vacation from April 1 to April 6. On April 8, his parents returned him to Children's Colorado when he refused to go to school, resulting in Zachary being readmitted to the NSC day treatment program.

Later in April, Depew and Children's Colorado staff more than once discussed possible plans for Zachary's return to school. Zachary had a successful transition day back to school on April 17, but his continued refusals and other behaviors resulted in continuing day treatment. Depew also talked with Children's Colorado staff about strategies the District had used to deal with Zachary's behaviors, as well as strategies for Zachary's transition back to school, which the evidence indicates was contemplated by staff at both Children's Colorado and the District. During the February to May 2014 Children's Colorado hospitalization period, Zachary attended school at Place Bridge only a couple of days.

During that period, Zachary's parents repeatedly expressed their feelings that Zachary might require admission to a residential facility because of the escalating behavioral issues that they felt unable to manage in the home. Zachary's treating psychiatrist at Children's Colorado, Dr. Sannar, thought that Zachary's behavior was

"not as bad as a lot of kids we see," and did not require residential placement. The parents doubted the return to school would be successful, and while they acknowledged the need to try, in May 2014 they submitted an application to enroll Zachary at Latham. They did not inform the District of this fact at that time.

Zachary was discharged from day treatment at Children's Colorado on May 27, 2014. After discharge he returned to school for the brief remainder of the term and participated in his eighth grade graduation ceremony.

While Zachary was hospitalized for much of the time from February to May 2014, District personnel continued to plan for his anticipated transition to East High School for the 2014-2015 school year. The IEP team consisted of some fifteen people, including Zachary's parents, a parent advocate, a special education teacher, a general education teacher, a school building representative, a speech language therapist, an occupational therapist, a school nurse, the school psychologist, a physical therapist, the school social worker, Zachary's language arts special education teacher, and a representative of the District's transportation department. Dr. Sannar, the psychiatrist who headed Zachary's treatment team at Children's Colorado, as well as an NSC therapist, also participated in the meetings by telephone. The team met twice in May 2014, for a total of some five hours, to review and reevaluate Zachary's IEP for the upcoming year.

Because Zachary had not been in school much since February, the IEP team had to rely largely on what was known before his hospitalization. Dr. Sannar and the therapist from Children's Colorado provided additional input based on their experience with Zachary during treatment. The parents also provided their input. IEP team

8

members from the District recommended that Zachary enroll in his neighborhood school, East High School, in an integrated setting of special and general education classes. The Children's Colorado treatment team did not recommend placement in a residential treatment facility because they thought there were additional interventions that should be tried to maintain Zachary in a less restrictive setting. Zachary's parents expressed their opinions that the IEP relied too heavily on Zachary's pre-hospitalization performance, did not accurately reflect the extreme home behavior that preceded his hospitalization, and did not accurately reflect his current needs.[8]

Because of his extended school absences from February to May 2014, Zachary was approved for the District's Extended School Year (ESY) program. ESY, which had daily sessions from 7:30 to 11:30 a.m. each day, was primarily intended to reinforce students' existing skills, rather than teach new ones. Zachary attended every day from June 13 to July 11 (at Bruce Randolph Middle School), arriving late on two days due to school refusal behavior. Zachary's ESY case manager, Deborah Carney, is a special education teacher at East High School. She acknowledged that there was an incident with Zachary shoplifting some food on a field trip, which the parents allege led to the anxiety and school refusal behaviors that caused him to be late two days. She testified, however, that Zachary did well at ESY, participated socially, was very involved in a talent show and drama class, worked well with his teacher and paraprofessionals, and was not reported to have any physical aggression incidents or refusal behaviors.

---

[8] This input included the parents' statement that they "do not agree that this IEP is an accurate reflection of Zach's Abilities [*sic*], and believe that the data presented that was done as a record review no longer represents their child's abilities and needs." Exhibit L, 000485.

Zachary's generally favorable experience at ESY contrasted with continuing escalation of behavior problems at home. Zachary refused to attend a private summer camp and freshman orientation at East High, and told his parents East High was too big and had too many classes and people and he would never go there. In an email dated July 17, 2014, Zachary's mother informed the District that the parents were "certain that he will not be able to return to school in the fall and that he cannot be educated in a traditional school setting due to his Prader-Willi syndrome."[9] The same email stated that Zachary needed immediate placement in a PWS-specific residential facility, that the parents would be making a decision on the specific facility "in the very near future," and that they would like to "partner" with the District on the placement.[10]

On August 1, 2014, after a meeting at East High to introduce Zachary to staff that would support him there during freshman orientation, Zachary became upset and allegedly attacked his parents and his therapist in the East High parking lot, escalating to the point that police and paramedics had to be called to transport Zachary to Children's Colorado for stabilization. Zachary's behavior led to three trips to the Children's Colorado emergency department in August. He was de-escalated during two of these visits and returned home; on the third he was readmitted to the NSC inpatient unit on August 18, 2014. He was discharged to day treatment on August 26 after stabilizing and reportedly doing well in inpatient care.

The District team continued planning for Zachary's attendance at East High. They understood that the Children's Colorado treatment providers were not

---

[9] Exhibit R, 000508.

[10] *Id.*

recommending residential placement. A number of meetings between District personnel and the parents were held from August 20 to September 6. These meetings, which now included the parents' attorney (and the District's), primarily addressed the parents' request for the District to pay for residential placement and the District's request for comprehensive testing to evaluate current Zachary's cognitive and behavioral status. The District requested the evaluation to enable it to assess appropriate placement. After involved negotiations, the parents agreed to the testing and the District agreed to pay the cost of Zachary's readmission to the Children's Colorado NSC day treatment program while the evaluation was being done.

The evaluation was conducted, over several days in late August at a building on the East High campus separate from the main school building. It included physical therapy, speech/language therapy, and cognitive assessments. Zachary attended and was cooperative. Consistent with Zachary's previous assessments and experience, he tested within or above the average range on verbal literacy skills, but significantly below average in math and reading comprehension.

The District team continued to believe that it could provide Zachary an appropriate education at East High School. Gene Bamesberger, associate director of special education for the District, was the leader of the IEP process for the District in connection with the transition to high school. The parents opposed implementing the IEP and continued to urge residential placement.

The District offered to assist with his school refusal behaviors by arranging for a transitional period of "homebound" educational services before Zachary would attend at

East High as a regular student. Although called "homebound," the services were provided at East High. The parents and the District agreed that holding the classes at home would not be productive because of Zachary's difficult home behaviors. The parents objected to having the classes at East High, but they ended up being conducted in East's main building – over the parents' objection – after another suitable location could not be found.

Zachary was scheduled to attend homebound classes for three hours per day, five days per week, from September 24 through November 21, 2014. He attended 14 of the first 17 days, refusing to attend on three days. He stopped attending October 17 when his parents had him admitted to The Children's Institute in Pittsburgh, Pennsylvania, in an effort to obtain more help with his problematic behavior.

Zachary's homebound teacher at East High, Kim Sutherland, testified that on the days he attended, Zachary performed well in reading and writing, but not so well in math. Ms. Sutherland testified Zachary did not access any unauthorized food during the homebound session. She did change the room being used because there was a bowl of fruit in the original room that caused Zachary's mother to raise a concern. Sutherland was involved in one significant behavioral incident when Zachary refused to stay when his mother attempted to drop him off at school. Ms. Sutherland, with the help of a school security officer and the school psychologist, ultimately calmed Zachary down and got him to stay and complete the school day, but not without getting her hair pulled. She testified that Zachary did not have to be restrained, that she was not injured, that the hair-pulling was minor and not painful, and the incident was a "2 on a scale of 5"

compared to other students she has dealt with.[11] She was aware of no other verbal or physical aggression by Zachary while she was working with him.

Ms. Sutherland testified that Zachary knew his way around East High, interacted in passing with students and teachers he recognized, was able to complete assignments, responded well to his environment, and participated in all of the services she was providing. During the week before he was to leave to go to The Children's Institute in Pittsburgh, however, he was perseverating and experiencing anxiety about it every day. Mr. Bamesberger testified that Zachary "did really well" in the homebound session – interacting with staff, dressed and groomed, engaged and completing academic work.[12]

Zachary was an inpatient at the Center for Prader-Willi Syndrome at The Children's Institute in Pittsburgh from October 20 to December 19, 2014. Dr. Gregory Cherpes, his treating psychiatrist, reported that Zachary remained very symptomatic while at The Children's Institute in Pittsburgh – not a high level of aggressive behavior, but mood changeability, anger outbursts, and sleep disruption patterns were present and generally unresponsive to medications and behavioral therapy. He stated Zachary was on the "high end" of the spectrum for such behaviors, and did not respond to treatment as well as typical patients.

Zachary also attended classes at The Children's Institute in Pittsburgh. His instruction was provided by Dr. Amy McTighe, a special education expert who deals exclusively with students with PWS. Dr. McTighe testified that Zachary's psychological

---

[11]  Record Vol. 6, 2629:17-2630:22.

[12]  *Id.,* 2801:10-2802:5.

issues affected his attendance at The Children's Institute in Pittsburgh worse than any student she had worked with, and his refusal to participate, while not violent, was the worst of any student she has had. His perseveration about food was also atypically high, in her experience, and it affected his ability to learn.

The District's IEP team continued work in late 2014 to prepare an IEP designed to replace the one prepared in May 2014. An initial meeting was held September 29, and the team met three more times in December. The IEP proposed on December 17, 2014 continued to call for Zachary to be educated at East High.

At least two of the December 2014 IEP team meetings included input from personnel from The Children's Institute in Pittsburgh by telephone. Neither Dr. Cherpes nor Dr. McTighe recommended residential placement at that time. Dr. McTighe provided written recommendations for the IEP that contemplated Zachary's return to public school, concluding that *if* these recommendations were followed with fidelity and Zachary still could not successfully access an education, then she would recommend placement in a residential, PWS-specific facility.[13] The December 2014 IEP did not include all of Dr. McTighe's recommendations, but did include provisions concerning Zachary's PWS and the need for food security. It also had a transition plan to make Zachary's return to East High more gradual, given the length of time he had been away at The Children's Institute in Pittsburgh.

The parents, with their attorney, participated in the December 2014 meetings. The December 2014 IEP included statements inserted at the parents' request, rejecting the IEP as not being appropriate to provide Zachary a FAPE and expressing their view

---

[13]  Exhibit BB, 000611.

that he had been unsuccessful in the *most* restrictive environment possible (The Children's Institute in Pittsburgh) and therefore had no chance of success at the less restrictive environment at East High. The parents stated their intent to file a due process proceeding and seek to place Zachary at Latham at the District's expense, although they also expressed a willingness to participate in another IEP meeting after the discharge report was received from The Children's Institute in Pittsburgh, and to consider a different offer of FAPE.

After the December 2014 IEP was prepared, Mr. Bamesberger emailed Zachary's parents, stating the District was ready, willing and able to implement the IEP beginning in January 2015. Zachary's mother responded that Zachary would not be attending East High. The District maintained its offer and reconvened the IEP team on March 4, 2015 to review and revise Zachary's IEP as needed. By this time the District had received the discharge documents from The Children's Institute in Pittsburgh, which contained additional information and recommendations to be considered for inclusion in the IEP.

The District had also received a letter from Dr. Janice Forster, written on Plaintiffs' behalf. Dr. Forster is a child and adolescent psychiatrist in Pennsylvania who specializes in PWS and consults with families and schools – including Latham, where Zachary was ultimately placed – concerning IEPs for PWS students. Dr. Forster criticized the goals that had been set in the December 2014 IEP. Mr. Bamesberger testified that this caused consternation among the District IEP team members because the goals had been based on the District's prior consultation with The Children's

Institute in Pittsburgh personnel, but that the team nonetheless spent a lot of time reconsidering and restating the goals in light of all of the new information.

The March 2015 IEP is the final IEP and the ultimate focal point in considering whether the District offered a free appropriate public education under the IDEA. Much of the March 2015 IEP was unchanged from the December 2014 plan, but it included additional detail concerning the accommodations to be provided, including:

- All paraprofessionals, teachers, and staff would be highly trained about Zachary's diagnoses, including PWS, the importance of food security, and other relevant information about Zachary.

- More than one paraprofessional would be trained to support Zachary.

- Zachary would be provided time and a safe place to "regroup and process" with appropriate staff to support him.

- Plans would be created for application across all environments.

- Plans would be provided that could be shared with Zachary.

- The District would consult with Zachary's in-home therapists and other providers.

- Food security would be provided in the classroom and across all settings Zachary would access, supported by a trained 1:1 adult supervisor.

- Staff would be trained in how to support Zachary in the event of a food security breach, including provision of a safe place to debrief him if necessary.

- The plan would be fleshed out through the training to ensure that staff would have a specific understanding of Zachary's needs due to PWS and his other mental health diagnoses.

- Additional accommodations and recommendations from the December 2014 IEP.[14]

The March 2015 IEP was further augmented by a Behavioral Implementation

---

[14] Exhibit LL, 000719.

Plan and an Implementation Plan.[15]  The latter provided considerable detail,[16] including:

- Zachary's schedule would provide his school day within a specific smaller "footprint" within East High, primarily the second floor and east hallway, and use an entrance separate and away from the main entrance where other students would be congregating and possibly consuming food.[17]

- The District would offer a transition plan that would have Zachary start at East with two class periods and add a class per week; but would also be willing to implement his full schedule immediately if desired by his family.

- Zachary would have an abbreviated schedule, from 9:00 to 2:00, to avoid times of day when other students would be most likely to have unstructured time.

- Zachary would be provided a "reverse inclusion" lunch (he would bring his lunch from home), which would occur in one of the classrooms in his footprint; lunch would be supervised by a paraprofessional; other appropriate students would be invited to join him and provide an opportunity to practice social skills.

- Zachary would be supported by two paraprofessionals at all times, both trained to support Zachary through any circumstances. One would be responsible for clearing an area of food (being consumed by students, for example), waste, and debris prior to Zachary's movement through the footprint. The second would accompany Zachary throughout the day to ensure physical food security.

- At the beginning of Zachary's day, the paraprofessionals stationed at East to support him would receive a radio call that the bus transporting Zachary to school is en route, allowing them to clear the entrance area of any students who might be eating, food waste, etc. These paraprofessionals would similarly accompany Zachary to his bus at the end of his day.

- Zachary's educational team and key staff (including administrators, teachers, behavior specialists, bus drivers, and paraprofessionals) would receive initial training consisting of a minimum of two hours of direct

---

[15]  Exhibits MM and NN, respectively.

[16]  Exhibit NN, 000729-30.

[17]  District witnesses testified that this smaller footprint was planned to reduce the potential for unintended exposure to food or food-related items, such as vending machines, garbage cans, etc., and that all such items would be cleared from the subject area. Mr. Bamesberger and several other District witnesses testified that they walked the area to confirm that it could in fact provide the necessary food security.

training in PWS and working with Zachary to implement his IEP, including training in enforcing a food-free zone to meet Zachary's food security needs. Ongoing training would be provided as needed.

- Zachary would be provided with door-to-door transportation from home to school and back, accompanied by at least one behavior specialist along with a bus paraprofessional; Zachary's lunch would be placed in a secured cooler on the bus.

- To supplement the transportation plan, the District identified five members of the District-level special education support team who are "highly skilled in supporting behavior management" to develop a plan to support Zachary from his bedroom to the bus, including assisting the family in his home in the morning, teaching him skills he would need to prepare to get on the bus in the morning, working intensively with Zachary to support his morning routine, and collaborating with the family and the family's private therapists to support this aspect of the plan.[18]

- Zachary's team would collect appropriate behavioral data, report to the parents, and immediately address any breaches in food security, including disciplinary actions for both students and staff as appropriate.

The District also provided the family a copy of the proposed bus route (designed to avoid driving by restaurants and food-related businesses), Zachary's proposed class schedule, and a map of the school building to enable the family to understand and comment on the plan.

Plaintiffs did not accept the District's offer of FAPE as set forth in the March 2015 IEP. Instead, on May 6, 2015 Zachary was enrolled at Latham. Zachary's parents had submitted an application to Latham a year earlier, in May 2014. Bamesberger testified that he had not seen the application, or been aware of it, until he saw it in the documents produced by Plaintiffs in discovery in the administrative proceeding. Latham

---

[18] Mr. Bamesberger testified that the original plan, for door-to-door transportation, was modified to provide additional accommodation when Zachary's parents said the real problem in connection with Zachary's school refusal behavior was in getting him from his bedroom to the front door. Record Vol. 6, 2844:13-2845:14. This problem had not been reported to Mr. Bamesberger when Zachary was at Place Bridge. *Id.*

is a nationally-recognized, accredited facility that specializes in educating individuals with PWS.[19]

## Analysis

The question presented is whether Plaintiffs proved by a preponderance of the evidence that the IEP of March 2015, to be implemented by the March 2015 Implementation Plan, was not "reasonably calculated to enable [Zachary] to receive educational benefits"[20] within the least restrictive environment.[21] Although the law in this circuit is that a FAPE does not require the educational benefit to be meaningful,[22] that standard was applied by the ALJ[23] and is also being applied in this ruling.

The focal point of the dispute is whether it is possible for the District to provide sufficient food security to enable Zachary to benefit from the education offered by the District. The parents claim that residential placement at a PWS-specific facility is necessary to provide adequate food security to enable Zachary to learn. That claim was

---

[19] Plaintiffs did not present evidence of Zachary's progress or performance at Latham. There being no evidence in the record, the Court does not consider the unsupported statements in Plaintiffs' briefs in this Court concerning his experience there. It is also irrelevant. An IEP is not inadequate "simply because parents show that a child makes better progress in a different program." *O'Toole by and through O'Toole v. Olathe Dist. Schools Unified Sch. Dist. No. 233*, 144 F.3d 692, 708 (10th Cir. 1998) (*quoting Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 132 (2d Cir. 1998)).

[20] *Bd. of Educ. v. Rowley*, 458 U.S. at 206-07.

[21] Plaintiffs do not claim that the District failed to comply with the IDEA's procedural requirements.

[22] *See, e.g., Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1,* 798 F.3d 1329, 1339-40 (10th Cir. 2015) *cert. granted*, No. 15-827, 2016 WL 5416228 (Sep. 29, 2016) (the Tenth Circuit, unlike some others, requires only that an IEP provide a child with "some," rather than "meaningful," educational benefit).

[23] *See* Decision at 24 ("To meet the requirements of the IDEA, [an IEP] need only be reasonably calculated to provide meaningful educational progress. The District's plan meets that test.").

supported by the opinions of witnesses with particularized knowledge and treatment of children afflicted with PWS and related disorders.

The District does not dispute that food security is extremely important to enable Zachary to participate in his classwork and educational opportunities. The March 2015 IEP addresses it at length. Plaintiffs' claim of inadequacy relies specifically and heavily on the concept of "total food security" developed by one of their experts, Dr. Forster, and testified to by some other witnesses. Plaintiffs' position is that because there is no educational placement within the District that can provide "total" food security, the District is incapable of providing an appropriate education and therefore is required to pay the costs of Zachary's residential placement at Latham. A *de novo* review of the evidence on food security, however, confirms the ALJ's finding Plaintiffs have not supported their claim by a preponderance of the evidence.

Called by Plaintiffs, Dr. Forster is a psychiatrist in private practice who specializes in PWS and consults with both parents and school districts about developing IEPs for students with PWS. She testified that "total food security" involves both physical security (preventing access to food except at set times and then only predetermined foods and amounts) and psychological security (teaching the individual that he has no hope of obtaining food except as authorized). She testified that total food security must be maintained for PWS patients at all times and across all settings, including home, school, and community, to avoid breaches that lead to anxiety, behavioral problems, and, in school, the inability to learn. Dr. Forster opined that Zachary cannot access an education if he is not in a residential placement.

Despite Dr. Forster's qualifications, the credibility of her specific opinions about the District's ability to provide an appropriate education to Zachary, given his particular needs, was undermined by a number of factors. She had only two limited contacts with Zachary. The first was a "hallway conversation" at a conference in Denver for PWS parents, some uncertain time after 2010 but more than a year before the hearing, at which she briefly met Zachary. The second was a clinical interview in October 2014, when Zachary was on his way to The Children's Institute in Pittsburgh. At that meeting she did only limited standardized testing. Other than those two meetings, she relied primarily on reports of Zachary's parents and treating psychiatrists.

Dr. Forster never observed Zachary in a home or public school setting. She was very familiar with Latham, but had not visited East High School. Her help had been enlisted by the parents or their counsel by August 2014,[24] but she did not participate in any of the District's IEP development meetings. She testified that she was "not optimistic" that the collaborative approach between educators and the family called for in the December 2014 IEP would succeed in dealing with refusal behaviors.[25] But she admitted she did not compare the recommendations of the providers at The Children's Institute in Pittsburgh with the ultimate March 2015 IEP which, based in large part on those recommendations, detailed the District's proposal to deal with both food security and school refusal.[26]

---

[24] *See* Exhibit N, 000494 (indicating that Dr. Forster submitted a letter in connection with the parents' request for District funding of residential placement for Zachary).

[25] Record Vol. 5, 1929:21-1930:21.

[26] *Id.*, 1953:5-19.

Because of her lack of particularized, personal knowledge of Zachary, the educators who had worked with him, the IEP, and East High School, Dr. Forster's ultimate opinion on whether the District had offered a FAPE was only generic:

> Q: Dr. Forster, do you have an opinion . . . whether, given [Zachary's] individual needs, he can receive an appropriate education *in a typical high school with special education modifications*."
>
> A: Yes, I have an opinion. And the answer is no, he cannot.[27]

Since the issue before this Court is whether the District offered a FAPE in a specific IEP applicable to the specific circumstances of this case, this opinion is of little value.

Elizabeth Roof, a licensed clinical psychologist and research specialist at Vanderbilt University with expertise in evaluating children with PWS, testified for Plaintiffs. She evaluated Zachary as part of a research project in 2010 and again in 2012, with three follow-up "check-ins" in between and a number of communications with his parents after that. She opined that Zachary is in the most severe one percent of people who are afflicted with PWS. Ms. Roof testified to the importance of "total food security," and the need not only to control access to food, but also to eliminate psychological stimuli related to food, such as seeing or smelling it. She opined that because of Zachary's sub-type of PWS and the severity of his food-seeking symptoms, total food security is necessary for him to be able to learn, and the District's IEP could not adequately address Zachary's food security needs.

Ms. Roof's testimony about total food security implicitly acknowledged that "total" cannot be taken in some absolute, literal sense. While observing that most parents of PWS children lock all food storage units and control the types and quantities of food at

---

[27]  Record Vol. 5, 001934:25-001935:6 (emphasis added).

meals and snacks, she recognized there are still occasions when such total control is not possible. For example, she stated that "[m]ost parents supervise at church functions, Grandma's house, social occasions."[28] At Vanderbilt, where she works, "when we see patients we try really hard to make sure there is no food. We kind of sweep the area to make sure there is no food in the area."[29] She volunteered that at the hospital where she sees PWS patients there is a kitchen where there may be cookies or muffins being baked and it is impossible to control the smells. They deal with that issue by taking practical steps such as scheduling appointments when there is no baking, taking patients directly to their rooms without lingering in the halls, avoiding seeing patients on days when there are catered events, or taking other steps to "try to environmentally control what we can."[30]

Those are the same types of practical measures the District proposed in detail in the March 2015 IEP and Implementation Plan that Plaintiffs reject as inadequate to provide total food security. In addition, Ms. Roof had not seen Zachary since October 2012. She testified that she is able to evaluate his needs and the District's ability to meet them based on information received subsequently from Zachary's parents, but had never observed Zachary at home or at school, had never spoken to his treating psychiatrists, Dr. Munro and Dr. Sannar, and had not reviewed the records from either Children's Colorado or The Children's Institute in Pittsburgh.

Dr. Carolyn Munro has been Zachary's treating psychiatrist since November

---

[28]  Record Vol. 4, 001240:22-23.

[29]  *Id.*, 001242:11-12.

[30]  *Id.,* 001274:12-001275:21.

2013, when he was in eighth grade. She was called as a witness by Plaintiffs. Her perspective is strictly medical, with no expertise in education. She offered important insights into the severity of Zachary's symptoms and behaviors from 2013 to 2015, the many changes in medications that occurred during that period, and the events leading to his hospitalizations at Children's Colorado and The Children's Institute in Pittsburgh. Based on her observations, she opined that Zachary may be at the "prodromal" stage of a psychotic disorder.

From her medical viewpoint, Dr. Munro opined that residential placement would be appropriate for Zachary. She never spoke with any of Zachary's teachers, paraprofessionals, or other staff at the District who had dealt with Zachary in the educational setting. She also acknowledged that in April 2014 she agreed with Dr. Sannar, the psychiatrist at Children's Colorado, that a transition back to Zachary's neighborhood school was the goal upon his discharge.

Another Plaintiffs' witness was Dr. Cherpes, who was Zachary's treating psychiatrist at the Center for Prader-Willi Syndrome at The Children's Institute in Pittsburgh, and never observed Zachary anywhere else. He acknowledged in his testimony that placement in a residential setting is a very unusual recommendation for people with PWS. He testified that the Center for PWS at The Children's Institute in Pittsburgh provides total food security, and recommended that Zachary be in an environment that provides total food security across all settings, which he equated with a residential placement with a trained staff to accompany him into the community when appropriate.

But Dr. Cherpes' notion of total food security was also not termed in absolutes.

He said that at The Children's Institute in Pittsburgh it means no access to food except

at specific meal and snack times, and a "tightly controlled environment" where staff

members do not eat on the premises and food does not go in trash cans.[31] When he

made recommendations for Zachary on his discharge from The Children's Institute in

Pittsburgh and expected return to school, he said that Zachary would require "food

security" in the "home, academic, and community settings, " which meant that "Zachary

has no unsupervised access to food, has a planned and predictable menu, and does

not have unnecessary exposure to foods."[32]

These are precisely the precautions included in the March 2015 IEP for dealing

with food security. And Dr. Cherpes' discharge recommendations did not slavishly use

"total" or "complete" in connection with discussions of food security, the very

shortcoming for which Plaintiffs fault the District's IEPs.[33] In contrast to his testimony at

the hearing five months later, Dr. Cherpes did not recommend a residential setting for

Zachary on his discharge from The Children's Institute in Pittsburgh in December 2014,

and was hopeful at that time for his successful return to his public school. Dr. Cherpes

had not spoken to Zachary's teachers from Place Bridge, the ESY session, or the

homebound session at East High School.

Dr. Amy McTighe, the inpatient education coordinator and teacher at the Center

---

[31] *Id.*, 001419:7-19.

[32] *Id.*, 001458:7-18; Exhibit 39 at 000338.

[33] *See, e.g.,* Exhibit 69, 00359 ("Food security must be provided in home, academic, and community settings."); 00360 (repeated references to "food security"); 000366 (same).

for Prader-Willi Syndrome at The Children's Institute in Pittsburgh, testified for Plaintiffs. She consults with school districts concerning development of IEPs and recommendations for placing students with PWS, and participated in a "full training conference" call with District staff members while Zachary was still at The Children's Institute in Pittsburgh.

Dr. McTighe testified that during the call she explained PWS to District personnel and discussed "recommendations that we would make for Zachary to be successful in the Least Restrictive Environment, which was his local public school."[34] As this testimony indicates, in December 2014 she considered Zachary's neighborhood school to be the least restrictive environment and she was not recommending residential placement for Zachary.[35] Her discharge report confirms that, containing numerous references that assume Zachary would be at his public school.[36] It emphasized the need for "complete" or "total" food security, including keeping Zachary from exposure to any food or food smells.

Dr. McTighe also testified that certain of her recommendations were not included in the December 2014 IEP – it did not provide that individuals working with Zachary have experience with persons with PWS (as opposed to merely training in working with them); it did not use the phrase "complete food security" or "total food security"; and her recommendations concerning provision of mental health psychological services were

---

[34] Record Vol. 4, 1364:4-9.

[35] Dr. McTighe was not asked at the hearing about her present understanding of the appropriate least restrictive environment for Zachary as required by the IDEA.

[36] *See, e.g.,* Exhibit 20, 000201-205.

not included "with fidelity."[37]

Dr. McTighe's recommendations for complete food security implicitly acknowledged the reality that Zachary would not be completely sequestered, either at home or at school, and that occasions would arise when flexibility in food security would be required. For example, while her recommendations included on one page a statement that Zachary should not be exposed to community-based instruction trips or vocational experiences anywhere that does not have "complete food security,"[38] she also stated, on the next page: "Alternative activities *or a clear plan for how food security will occur* should be provided to Zachary and his family during community based activities (e.g. field trips, special events scheduled in the community, etc.)."[39] Her food security recommendations assumed a return to school, not a residential placement:

> Q: And at the time of his discharge, your specific recommendation on the discharge summary was that he should return to his previous school. Isn't that right?
>
> A: That is right, yes.[40]

It was only if her recommendations "were followed with fidelity and Zachary still cannot successfully access an education" that Dr. McTighe recommended placement in a

---

[37] Record Vol. 4, 1390:21-1397:4.

[38] Exhibit 20, 000203.

[39] *Id.*, 000204 (emphasis added). The discharge paperwork from The Children's Institute in Pittsburgh contains recommendations from another staff member with similar recognition that even total food security necessarily requires practicality. *See* Exhibit 69, 000376 (stating that "complete food security" should be provided, but also providing guidance for what that means in special setting: "When he is in an area where food is not secure (picnic, family gathering etc.), constant 1-on-1 supervision is required. Designate 1 person to supervise at a time."); 000377 (outlining steps to take when "eating out, attending special events, and participating in holidays").

[40] Record Vol. 4, 001381:5-8.

residential, PWS-specific facility.[41]

The District has shown awareness of the requirement of food security for Zachary in his time at school and had provided for it in the past.[42] District staff members took affirmative actions to accommodate that need.[43] The evidence shows no history of food security issues that prevented Zachary from accessing his education before his hospitalizations. The hospitalizations at Children's Colorado and The Children's Institute in Pittsburgh were precipitated by escalating adverse behaviors at home. The evidence did not credibly link them to any food-related incident(s) at school. And unlike Plaintiffs' opinion witnesses, who were not familiar with East High and had not observed Zachary in his neighborhood school setting, the District's witnesses included educators who had taught and worked with Zachary at school, and other educational and IDEA experts who had physically studied and walked the footprint of Zachary's school day at East High, as proposed in the IEP.

The concept of total food security, even as articulated by Plaintiffs' witnesses at trial, required the District to take careful, strict measures to provide both physical and

---

[41] Exhibit 20, 000205.

[42] The April 2013 IEP developed for Zachary's eighth grade year discussed Zachary's PWS and food security issues at some length, recognizing that "[t]he total school environment must be managed in order to minimize [Zachary's] food-driven behavior and thus his emotional outbursts" and that "training may be necessary in behavior management and effective strategies to manage food issues." Exhibit F, 000417-18.

[43] Venita O'Hara, a general education teacher who taught Zachary at Place Bridge, testified to one such effort. She knew that a teacher there used an activity with an Oreo cookie to demonstrate certain science equipment. Ms. O'Hara contacted Zachary's parents to discuss whether the activity would be appropriate for him. When they objected, Ms. O'Hara raised the issue with the science teacher, who considered keeping Zachary out of the classroom for the activity, but instead of excluding him from an activity that involved interacting with his non-disabled classmates, the teacher changed the curriculum to avoid using food. Record Vol. 5, 2100:24-2102:22.

psychological food security – that is, control Zachary's ability to access food and prevent his exposure to food and food-related smells, sounds, and sensations. The March 2015 IEP and Implementation Plan did that. The fact that the IEP does not use the *term* "total food security" does not mean, as Plaintiffs suggest, that the District did not take food security seriously[44] and did not take reasonable steps to implement what Plaintiffs' own witnesses described as the *features* of total food security. The March 2015 IEP was reasonably calculated to provide total food security, even as defined by Plaintiffs' witnesses.

The sufficiency of the District's March 2015 IEP and Implementation Plan to provide total food security for Zachary cannot be known because Plaintiffs refused to allow Zachary to attend East High. The District demonstrated that it was making a reasonable, carefully-considered effort to determine and provide the food security Zachary needed, based on the District's direct experience with Zachary and the recommendations of his care providers. It fleshed out those recommendations in the detailed Implementation Plan that provided support for Zachary from his bed to school in the morning and back home in the afternoon. The District's position that the March 2015 IEP was reasonably calculated to provide Zachary an appropriate education, notwithstanding his PWS and consequent food security needs, is supported by the evidence.

To the extent Plaintiffs similarly assert that the District was incapable of providing a FAPE because of its inability to deal Zachary's school refusal behaviors, the evidence

---

[44] *E.g.,* Reply Brief at 1-2 (asserting that "total food security [is] a concept that the School District neither recognizes nor an environment it attempts to provide for").

similarly weighs in the District's favor. The home environment did provide food security but Zachary's aggressive, disruptive, and refusal behaviors, during 2014 in particular, were far worse at home than what the District's educators observed at school.[45] The parents took issue with the District's IEPs for that reason, asserting that the IEPs did not accurately reflect Zachary's present levels of behavioral problems.

But the evidence demonstrated, through testimony from Zachary's teachers and other professionals who worked with him at school, that the District had managed his school behaviors sufficiently well that he was able to learn and make progress until his successive, extended hospitalizations beginning in February 2014. After that, even though Zachary was not at school on a regular basis, the IEP team actively sought and included information about Zachary's progress from his parents and care providers, and recommendations of his teams at Children's Colorado and The Children's Institute in Pittsburgh, as to how to deal with problem behaviors, as well as food security. Notably, no one from either of those facilities recommended to the District that Zachary be placed at a residential facility upon discharge.

Based on their efforts to keep current with Zachary's behavioral issues, the IEP team repeatedly modified and elaborated on the steps that would be taken, including training all District personnel who would be in contact with Zachary, providing behavior specialists and a support team trained in behavior management, and working with the family and its in-home care providers to assist with Zachary's school refusal behaviors.

---

[45] This is not to question the accuracy of the parents' reports. It is simply evident that Zachary's refusals and other behaviors were worse at home, with his parents, than elsewhere. Dr. Sannar testified that at Children's Colorado they similarly "did not see the same type of externalizing behaviors or aggression as I think he was exhibiting at home." Record Vol. 5, 2167:18-2168:3.

Because the parents stated that a major problem was getting Zachary out the door to get on the school bus, the Implementation Plan sought to bridge the transfer by providing trained personnel from bedroom to classroom with a dedicated bus following a route designed to be free from any distracting food stimuli.

The accommodations provided in the IEP, Behavior Implementation Plan, and Implementation Plan all reflect a concerted, more-than-reasonable effort to be aware of, prepare for, and deal with the behaviors that were reported. Plaintiffs have not shown by a preponderance of the evidence that the District's IEP could not provide a FAPE in light of Zachary's school refusals or other adverse behaviors.

Plaintiffs also argue that Latham is the "least restrictive environment" (LRE) for Zachary, as required by the IDEA. Congressional findings supporting enactment of the IDEA recognize that "[d]isability is a natural part of the human experience and in no way diminishes the right of individuals to participate in or contribute to society," and that "[i]mproving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities."[46]

The purpose of providing educational services to disabled children is to give them an opportunity to become contributing adults in the larger society. That is the broader purpose of public education. Our schools function to do more than develop academic abilities. They serve to develop social skills in the individual student for the benefit of the community in which he will live as an adult. The statutory requirement that the disabled child be provided with educational services in "the least restrictive

---

[46] 20 U.S.C. § 1400(c)(1).

environment" is defined as being educated "with children who are nondisabled" to the maximum extent possible.[47] Latham does not meet that requirement because it is limited to students with PWS.

Plaintiffs' witnesses opined that this was an appropriate peer group but while that may be the most therapeutic environment, and may indeed provide benefits to Zachary, it does not comply with the requirements for funding under the IDEA in the circumstances shown in this record. First-hand testimony affirmed that the aspirational goals of the IDEA were, in fact, being served by the District: Zachary benefited from being able to interact and learn – academically and otherwise – with his non-disabled peers. Ms. O'Hara testified that she "absolutely" observed benefits from Zachary being around his non-disabled peers, allowing them to demonstrate appropriate classroom and social behavior, and Zachary to demonstrate his own ability to "present himself as any other typical 7th grade or 8th grade student in that setting."[48] Plaintiffs did not show by a preponderance of the evidence that the District would not be able to continue to provide an appropriate education to Zachary in the less restrictive neighborhood school environment in which he had made meaningful educational progress until he was first hospitalized and then enrolled at Latham.

Because the parents did not permit enrollment at East High School, there was no opportunity to show the adequacy of the March 2015 IEP and Implementation Plan or that modifications could have been made for improvement, if necessary. Plaintiffs'

---

[47] 34 CFR § 300.114(a)(2)(i).

[48] Record Vol. 5, 2097:2-23.

approach to the District has been adversarial since May 2014. The District's IEP team

recognized that the transition to East High School, Zachary's neighborhood school,

required planning changes because of the size and the environment in that inner-city

school and the reported changes in Zachary's behaviors. Plaintiffs knew East High

School well because their older daughter had gone there. They were convinced that

Zachary could not progress in that new environment and expressly maintained that

belief even as they participated in IEP meetings beginning in May 2014, applying to

Latham at that time. They were convinced that Zachary could not progress at East High

School under any set of accommodations for his disabilities. They brought their lawyer

to the August 2014 and later IEP meetings and made it clear in December that they

would proceed with a due process hearing if their request for a residential placement

was denied. They persisted in that view in December 2014 after Zachary had been at

East High for the "homebound" services program in October. He knew students there

from his residential neighborhood. He had also interacted with non-disabled students in

the summer ESY program and was a leader and participant in theater and other

activities.

        The IDEA provides for an annual evaluation of an IEP. It is only applicable for

one academic year. It may be that if Zachary had enrolled at East High School the

District's plan would not have been effective, and that a residential placement would

have been proven necessary. We cannot know because the District was denied the

opportunity to show its efficacy. The evidence does not support Plaintiffs' assertion that

the District was *necessarily* incapable of providing Zachary a FAPE by implementing

this IEP and its supporting implementation plans.

## Conclusion and Order

The IDEA allows parents the option exercised by Plaintiffs here: if they believe their children are not receiving a FAPE in state schools, they may remove their children from public school, enroll them in private school, and request reimbursement from the school district. Parents who take such unilateral action, however, "do so at their own financial risk": if a school district denies the parents' request for reimbursement, a court may order it only if the public school placement violated the IDEA and the private school placement was proper under the IDEA.[49] Here, Plaintiffs failed to prove by a preponderance of the evidence that the District violated the IDEA by failing to develop an IEP that was reasonably calculated to provide Zachary with meaningful educational benefit.

Accordingly, it is ORDERED that the Decision of the ALJ is affirmed. Judgment shall enter in favor of the District and against Plaintiffs on their Complaint.

DATED:      October 5, 2016

BY THE COURT:

s/ *Richard P. Matsch*

_____
Richard P. Matsch, Senior Judge

---

[49] *Jefferson Cty. Sch. Dist. R–1 v. Elizabeth E. ex rel. Roxanne B.,* 702 F.3d 1227, 1232 (10th Cir. 2012) (quoting *Florence Cty. Sch. Dist. Four v. Carter,* 510 U.S. 7, 15 (1993)).